# In the United States Court of Federal Claims

No. 08-117L

(Filed: March 14, 2014)

| | |
|---|---|
| ********************************** )<br><br>**LOST TREE VILLAGE**<br>**CORPORATION,**<br><br>                    **Plaintiff,**<br><br>        **v.**<br><br>**UNITED STATES,**<br><br>                    **Defendant.**<br><br>********************************** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

| )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Takings claim arising from a denial by the<br>Corps of Engineers of a wetlands fill permit<br>sought under Section 404 of the Clean Water<br>Act; remand by court of appeals to address<br>economic loss of value to relevant parcel;<br>law-of-the-case doctrine; mandate rule;<br>*Lucas* analysis; *Penn Central* analysis; Rule<br>54(b) judgment |

Jerry Stouck, Greenberg Traurig, LLP, Washington, D.C., for plaintiff.  With him on the briefs was Danielle M. Diaz, Greenberg Traurig, LLP, Washington, D.C.

Jacqueline Brown, Trial Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs was Robert G. Dreher, Acting Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This remanded takings case focuses on a determination of the economic value of the previously defined relevant parcel.  Plaintiff, Lost Tree Village Corporation ("Lost Tree") sought a wetlands fill permit from the U.S. Army Corps of Engineers ("the Corps") for a 4.99 acre tract of land ("Plat 57") bordering a cove on the Indian River in east central Florida.  Lost Tree claims that the denial of that permit eliminated all economically viable use of Plat 57 and constituted a taking in contravention of the Takings Clause of the Fifth Amendment to the United States Constitution.  After a trial, the court previously ruled that the relevant parcel for the takings analysis encompassed Plat 57 and a nearby tract, Plat 55, along with scattered wetlands still owned by Lost Tree in a residential community known as John's Island.  *See Lost Tree Village Corp. v. United States*, 100 Fed. Cl. 412, 430-35 (2011) (*"Lost Tree I"*), rev'd and remanded, 707 F.3d 1286 (Fed. Cir. 2013) (*"Lost Tree II"*).  Based on that ruling, the court found that the permit denial resulted in a non-compensable diminution in value of the relevant parcel and directed judgment for the government.  *Lost Tree I*, 100 Fed. Cl. at 439.  On appeal, the Court of Appeals for the Federal Circuit held that the relevant parcel for purposes of the takings analysis

consisted of Plat 57 alone, not also neighboring Plat 55 and the scattered wetlands owned by Lost Tree. *Lost Tree II*, 707 F.3d at 1294. The court of appeals remanded for a "determin[ation of] the loss in economic value to Plat 57 suffered by Lost Tree as a result of the Corps' denial of the . . . permit, and then appl[ication of] the appropriate framework to determine whether a compensable taking occurred." *Id.* at 1295. Specifically, the court of appeals indicated that "[i]n determining the loss in value to Plat 57, the [trial] court may revisit the property values it adopted in the course of determining the impact of the Plat 57 permit denial on Lost Tree under its definition of the relevant parcel." *Id.*

**FACTS**

**A. John's Island**

Lost Tree was a land-development enterprise that entered into an option agreement in 1968 ("1968 Option Agreement") to purchase approximately 2,750 acres of property on the mid-Atlantic coast of Florida in Indian River County. *Lost Tree I*, 100 Fed. Cl. at 415. Various parcels of land were subject to the 1968 Option Agreement, including: (1) land on an unnamed barrier island on the Atlantic Coast, which is bisected by U.S. Highway A-1-A, (2) a westerly peninsula of the barrier island known as the "Island of John's Island" bordering the Indian River, (3) various other islands in the Indian River, including McCuller's Point, Gem Island, Pine Island, Sister Island, Hole-in-the-Wall Island, Fritz Island, and others, (4) submerged lands in and around the Indian River, (5) a "North Acreage" consisting of approximately 100 acres on the Indian River north of the barrier island, and (6) approximately 35 acres about five miles due west of Gem Island, known as the "West Acreage." *Id.*

Lost Tree began exercising its options in 1969 and continued to acquire parcels in a piecemeal fashion until 1974. *Lost Tree I*, 100 Fed. Cl. at 415. As part of its last acquisition, Lost Tree purchased Gem Island and the Island of John's Island, which included the land now comprising Plat 57. *Id.* Although the 1968 Option Agreement included a provision calling for an overarching land development plan, that provision was never enforced, and no master plan has since been discovered. *Id.* at 415-16. Beginning in 1969, and continuing for a number of years, Lost Tree developed on a seriatim basis, through the recording of approximately 56 distinct plats, roughly half of the property covered by the 1968 Option Agreement. *Id.* at 416. Those plats, totaling approximately 1,300 acres, ultimately became the greater part of a gated residential community known as "John's Island." *Id.* As the court previously noted, "Lost Tree, however, never owned all of the property encompassed by the gated community, and most knowledgeable people in the area would consider the community of John's Island to be inclusive of parcels which were neither covered by the 1968 Option Agreement nor ever owned by Lost Tree." *Id.* Lost Tree built the majority of the roads within the community and was responsible for the development of the infrastructure for the community. *Id.*

In August 1980, Lost Tree submitted to the Corps an application for a wetlands fill permit under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and a comparable permit application to the State of Florida's Department of Environmental Regulation. *Lost Tree I*, 100 Fed. Cl. at 416. Attendant to the permit applications, Lost Tree submitted a "Development Plan" for the Island of John's Island and Gem Island (the "1980 Development Plan"). *Id.* The 1980

Development Plan "propose[d] the creation of some 200 single family residences on about 400 acres of land." *Id.* (internal citations omitted) (alteration in original). This development plan included several drawings, including one in which a substantial portion of Plat 57 was shaded in green and labeled as a wildlife preserve. *Id.* at 417. The 1980 Development Plan, however, was effectively withdrawn when Lost Tree submitted a revised permit application in an effort to appease Florida's Department of Environmental Regulation. *See id.* The revised application deleted "all originally proposed project features" except a bridge and its approaches. *Id.* Accordingly, no distinct development plan for Plat 57 was ever recorded. Throughout the 1980s and early 1990s, Lost Tree received several Section 404 permits to continue developing its property. *See id.* at 417-18. In exchange, it recorded various conservation easements in favor of the local, state, and federal governments. *Id.* at 418. The development of Stingaree Point, the peninsula of the Island of John's Island on which Plat 57 lies, began in November 1985. *Id.* During development, a road was built and water and sewer service lines were stubbed out to plats neighboring Plat 57, but not to Plat 57 itself. *Id.*

In 1994, Lost Tree hired new management with the intention of shifting the business from land development to commercial real estate. *See Lost Tree I*, 100 Fed. Cl. at 418. As part of its new focus, Lost Tree sought to rid itself of residual land it owned in and near John's Island, land on which it continued to pay taxes but from which it received no revenue. *See id.* At this point, the parties agree that Lost Tree had no plans to develop the land constituting Plat 57. *Id.* at 423-24. Plat 57 "contains a mangrove swamp and wetlands that have been disturbed by scattered upland spoil mounds vegetated by an invasive species of pepper[] and by manmade ditches installed for mosquito control." *Id.* at 423 (internal citations omitted).[1] In early 2002, Lost Tree learned that another developer had applied for a wetlands fill permit for a property south of Plat 57 and had proposed certain improvements to a mosquito control impoundment at McCuller's Point as mitigation for that permit. *Id.* at 424. Lost Tree owned half of McCuller's Point, and as the owner of adjacent land, it was asked to approve any mitigation on McCuller's Point. *Id.* Lost Tree withheld approval, seeking permitting credits in exchange for the improvements that would be made. *Id.* To take advantage of these potential credits, Lost Tree sought the various permits and approvals required to develop Plat 57, believing that of its remaining land holdings, Plat 57 showed the most developmental promise. *See id.* at 424-25.

In August 2002, Lost Tree submitted an application to the Town of Indian River Shores requesting approval for the preliminary plat, among other things, and it submitted a permit application to the Corps for a Section 404 permit. *Lost Tree I*, 100 Fed. Cl. at 424-25. The town approved Lost Tree's application, and Lost Tree obtained appropriate zoning and all other local and state permits and approvals necessary to move forward with development. *Id.* at 425. In August 2004, however, the Corps denied the Section 404 permit because "less environmentally damaging alternatives were available to [Lost Tree] and the project purpose ha[d] already been realized through the development of home-sites within the subdivision." *Id.* (internal citations omitted) (alterations in original). The Corps acknowledged that if an applicant other than Lost Tree had sought the permit, it would have been granted. *Id.*

---

[1]The pepper species, *Schinus terebinthifolius*, is an invasive shrub or small tree that is native to Brazil and can irritate the skin in a manner akin to poison ivy. *Lost Tree I*, 100 Fed. Cl. at 423 & n.19.

The parties agree that without the permit, Plat 57 has a nominal value, not reflective of any economic use, but with the permit, Plat 57 is worth a substantial amount. Lost Tree's appraisal expert, Mr. Peter Armfield, testified that it would be worth $25,000 without the permit and $4,285,000 with the permit. *See* DX 134 (at ninth and tenth unnumbered pages).[2] The government's appraiser, Mr. John Underwood, testified that it would be worth $30,000 without the permit, *see* DX 136 at 48, and $3,910,000 with the permit, *id.*; *see also Lost Tree I*, 100 Fed. Cl. at 425-26.

### B. The Post-Trial Decision

Defining the relevant parcel was the key issue for decision in this case. The government sought to include all of the land acquired by Lost Tree pursuant to the 1968 Option Agreement, while Lost Tree sought to limit the relevant parcel to Plat 57. *Lost Tree I*, 100 Fed. Cl. at 430. Following a seven-day trial, this court determined that for purposes of a takings analysis, whether under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), or *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978), the relevant parcel included Plat 57, Plat 55 (a developed, nearby plat still owned by Lost Tree), and several scattered wetlands still owned by Lost Tree within the community of John's Island. *Lost Tree* I, 100 Fed. Cl. at 435, 437. Because of temporal considerations, the court excluded the properties that had been previously developed and sold by Lost Tree some years previously. *See id.* at 433. The value of Plat 55 was significant to the takings analysis, and the court determined that the permit denial for Plat 57 diminished the value of the defined relevant parcel by approximately 58.4%. *Id.* at 437. The court held that "[t]his degree of diminution plainly d[id] not constitute the type of total economic wipeout that constitutes a categorical taking under *Lucas*." *Id.* Accordingly, the court proceeded by applying the *Penn Central* factors to determine whether the resulting partial regulatory taking was compensable. *Id.* at 437-39.

In applying the *Penn Central* factors, the court determined that the character of the governmental action tended to favor Lost Tree because the Corps treated Lost Tree more adversely than it would have treated another applicant, and the value of the wetlands had been significantly reduced by prior mosquito-control actions. *Lost Tree I*, 100 Fed. Cl. at 438-39. The court found that the investment-backed expectations factor was virtually in balance with no weighting in favor of either side. *Id.* Lost Tree possessed very general expectations for the Island of John's Island and Gem Island when it purchased those tracts in making the last acquisition under the 1968 Option Agreement and it had generated specific expectations for Plat 57 beginning in 2001 or 2002, but those expectations were subject to the existing regulatory regime. *Id.* at 438. "Lost Tree's expectations were not objectively unreasonable given the adventitious projected development at McCuller's Point by The Estuary [the entity proposing the unrelated project that required mitigation], coupled with the facts that Lost Tree had property on the Point that was readily available for wetland improvement, *i.e.*, removal of a previously installed mosquito control project, and the State supported the project." *Id.* Ultimately, the court found the economic impact factor to be dispositive. "A diminution in value of 58.4% due to the regulatory action is insufficient to give rise to a taking despite the weight of the other *Penn Central* factors." *Id.* at 439.

---

[2] The government's trial exhibits are cited as "DX__."

### C. The Appellate Decision

Lost Tree appealed this court's decision, and the Federal Circuit reversed and remanded. *Lost Tree II*, 707 F.3d at 1288. The Federal Circuit held that the relevant parcel was Plat 57 alone. *Id.* at 1294. The court placed particular emphasis on the "'economic expectations of the claimant with regard to the property.'" *Id.* at 1293 (quoting *Norman v. United States*, 429 F.3d 1081, 1091 (Fed. Cir. 2005)). It explained that "even when contiguous land is purchased in a single transaction, the relevant parcel may be a subset of the original purchase where the owner develops distinct parcels at different times and treats the parcels as distinct economic units." *Id.* (internal citations omitted). The Federal Circuit concluded that Lost Tree had neither considered nor prepared Plat 57 for developments in the same way it had prepared the other portions of the John's Island community. *Id.* Plat 55, for example, had water and sewer lines stubbed out to it years prior to the events at issue, while Plat 57 did not. *Id.* at 1294. In so deciding, the court of appeals affirmed this court's factual findings, stating among other things that they "support the conclusion that Lost Tree had distinct economic expectations for each of Plat 57, Plat 55, and its scattered wetland holdings in the vicinity." *Id.* On remand, the Federal Circuit directed this court to

> determine the loss in economic value to Plat 57 suffered by Lost Tree as a result of the Corps' denial of the [Section] 404 permit, and then apply the appropriate framework to determine whether a compensable taking occurred. In determining the loss in value to Plat 57, the court may revisit the property values it adopted in the course of determining the impact of the Plat 57 permit denial on Lost Tree under its definition of the relevant parcel.

*Lost Tree II*, 707 F.3d at 1295.

Following receipt of the mandate, this court requested that the parties indicate whether they were prepared to adduce additional evidence regarding valuation. Order of July 22, 2013, ECF No. 139. Lost Tree declined to submit any additional evidence, asserting that the existing trial record contains sufficient evidence regarding Plat 57's fair market value with and without a permit. Joint Status Report at 1-2 (Aug. 26, 2013), ECF No. 142. The government, on the other hand, suggested that additional evidence would be helpful to flesh out a new valuation theory, taking into account a prospective buyer's uncertainty about whether a Section 404 permit would be granted. *Id.* at 5-6. After addressing whether it was either timely or appropriate for the government to pursue a new valuation theory in place of the approach it had taken at trial, Hr'g Tr. 12:3 to 13:22 (Sept. 10, 2013),[3] the court permitted the government to provide an evidentiary proffer explaining its proposed new evidentiary approach. Hr'g Tr. 21:4-8. Thereafter, Lost Tree submitted a Motion for Judgment on the Record, Pl.'s Mot. for Judgment on the Record ("Pl.'s Mot"), ECF No. 145, and the government filed a Cross-Motion for Judgment on the Record, Def.'s Cross-Mot. for Judgment on the Record ("Def.'s Cross-Mot."), ECF No. 146. A proffer accompanied the government's cross-motion. *See* Def.'s Cross-Mot. Ex. A (Unsworn

---

[3]Subsequent citations to the hearing conducted on September 10, 2013, will omit the date.

Decl. of John R. Underwood, Jr. (Nov. 19, 2013)) ("Unsworn Underwood Decl."), ECF No. 146-1. Briefing was completed on January 17, 2014, and a hearing was held on January 23, 2014. The case is ready for disposition.

## STANDARDS FOR DECISION

In deciding this case on remand, the court is bound by the mandate from the Federal Circuit and by its own prior findings in this case that are consistent with the Circuit's decision and mandate.  In that connection, "[t]he law-of-the-case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  *Banks v. United States*, 741 F.3d 1268, 1276 (Fed. Cir. 2014) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988)).  The doctrine rests upon the important public policy that "[n]o litigant deserves an opportunity to go over the same ground twice, hoping that the passage of time or changes in the composition of the court will provide a more favorable result the second time."  *Gindes v. United States*, 740 F.2d 947, 949 (Fed. Cir. 1984) (internal citation and quotation omitted) (alteration in original).  The mandate rule "dictates that 'an inferior court has no power or authority to deviate from the mandate issued by an appellate court.'"  *Banks*, 741 F.3d at 1276 (quoting *Briggs v. Pennsylvania R.R.*, 334 U.S. 304, 306 (1948)).  This rule applies "to issues 'actually decided, either explicitly or by necessary implication'" by the appellate court.  *Id.* (quoting *Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1335 (Fed. Cir. 2004)).  Three exceptions can, if applicable, cause the law-of-the-case doctrine and the more specific mandate rule to be overcome.  These exceptions appertain when: "(1) subsequent evidence presented at trial was substantially different from the original evidence; (2) controlling authority has since made a contrary and applicable decision of the law; or (3) the decision was clearly erroneous 'and would work a manifest injustice.'"  *Id.* (quoting *Gindes*, 740 F.2d at 950).

In its mandate in this case, as previously noted, the Federal Circuit required this court to "determine the loss in economic value to Plat 57 suffered by Lost Tree as a result of the Corps' denial of the [Section] 404 permit."  *Lost Tree II*, 707 F.3d at 1295.  Specifically, the court of appeals indicated that "the court may *revisit* the property values it adopted in the course of determining the impact of the Plat 57 permit denial."  *Id.* (emphasis added).

Lost Tree contends that in these proceedings on remand, the court should focus on the property values, noting that except for this court's conclusion respecting the relevant parcel, all other findings and conclusions made in the post-trial decision were accepted and adopted by the court of appeals.  *See* Pl.'s Mot. at 9-12; *see also* Pl.'s Reply in Support of Mot. for Judgment ("Pl.'s Reply") at 2-3, ECF No. 149.  The government, on the other hand, urges the court fully to reopen the record, reconsider all of the takings factors, and render judgment in its favor.  *See* Def.'s Reply in Support of its Cross-Motion for Judgment ("Def.'s Reply") at 2-5, 16, ECF No. 150.  Both parties appear to agree that the court has discretion to reopen the record insofar as the valuation of Plat 57 is concerned.  *See* Pl.'s Mot. at 10 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971), and *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362,

1379-80 (Fed. Cir. 1999)); Def.'s Reply at 6 (citing *Enzo Biochem*, 188 F.3d at 1379-80, and *State Indus., Inc. v. Mor-Flo Indus. Inc.*, 948 F.2d 1573, 1577  (Fed. Cir. 1991)).[4]

The parties' dispute about the scope of the court's ability to reopen the record centers on those factual findings that were made in *Lost Tree I*, reviewed and accepted by the court of appeals in *Lost Tree II*, and formed a basis for the Circuit's decision to overturn only this court's determination regarding the relevant parcel and remand for a determination of economic loss respecting Plat 57.  Ordinarily, those questions that were considered by the appellate court and accepted, or not disturbed, in connection with the appellate court's decision may not be reconsidered absent applicability of one of the exceptions to the mandate rule.  *Banks*, 741 F.3d at 1276 (citing *In Re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)); *see also Banks*, 741 F.3d at 1278 ("*Banks II* did not 'leave open' the issue of when [p]laintiffs' claims accrued.  The *Banks II* court held that the complaints were not barred by the six-year statute of limitations.  Necessary and predicate to the holding was a finding that the mitigation efforts delayed claim accrual.").  In those areas covered by the remand, however, the question of whether the record should be reopened turns on the extent to which the existing record was sufficiently developed to permit the necessary specific findings to be made upon remand.  *See Purex Corp. v. Procter & Gamble Co.*, 664 F.2d 1105, 1109 (9th Cir. 1981).

## TAKINGS PRINCIPLES

The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V.  Takings cases generally fall into one of two categories – those accomplished by a physical invasion of the property contrasted to those that arise as a result of a regulatory imposition.  *See Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001); *see also Lucas*, 505 U.S. at 1014-15; *Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1365 (Fed. Cir. 2004).  Where the government takes physical possession of private property, it must compensate the owner.  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002); *Bass Enters.*, 381 F.3d at 1365 (internal citations omitted).  When the government regulates the permissible use of a

---

[4]In their briefing, both parties cite and quote extensively from the Federal Circuit's decision in *Confederated Tribes of the Warm Springs Reservation of Oregon v. United States*, 101 Fed. Appx. 818 (Fed. Cir. 2004).  Relying on that decision as a precedent is contrary to Federal Circuit Rule 32.1(c)-(d), which in effect bars reliance on nonprecedential dispositions issued by the Federal Circuit or its predecessor before January 1, 2007, except where necessary for claim preclusion, etc.  *Compare Rates Tech., Inc. v. Mediatrix Telecom, Inc.*, 688 F.3d 742, 750-51 (Fed. Cir. 2012) (admonishing appellant for citing as precedent a case affirmed via Federal Circuit Rule 36 because it was a nonprecedential decision issued in 2000), *and Nash v. United States Postal Service*, 345 Fed. Appx. 560, 561 (Fed. Cir. 2009) (declaring that a nonprecedential decision issued before 2007 was "not citable" pursuant to Federal Circuit Rule 32.1(c)), *with Beres v. United States,* 104 Fed. Cl. 408, 454 n.42 (2012) (noting that Federal Circuit Rule 32.1 "makes no provision regarding the citation of nonprecedential dispositions issued before [2007]"), *and Distributed Solutions, Inc. v. United States*, 104 Fed. Cl. 368, 386 n.26 (2012) (citing an unpublished case from the Federal Circuit issued prior to 2007 as nonprecedential pursuant to Federal Circuit Rule 32.1(d)).

property, however, any resultant loss in value is not necessarily compensable.  *See Tahoe-Sierra*, 535 U.S. at 322-24.

A categorical duty to provide compensation to the owner who has suffered a regulatory taking arises only in the "extraordinary circumstance" where "*no* productive or economically beneficial use of land is permitted."  *Lucas*, 505 U.S. at 1017 (emphasis in original); *see also Tahoe-Sierra*, 535 U.S. at 330.  "A property owner must suffer a literal total loss in value to trigger liability on the part of the government for a categorical taking."  *Lost Tree I*, 100 Fed. Cl at 427 (citing *Lucas*, 505 U.S. at 1019 n.8, and *Tahoe-Sierra*, 535 U.S. at 330).  On the other hand, if the regulation "fall[s] short of eliminating all economically beneficial use, a taking nonetheless may have occurred," *Palazzolo*, 533 U.S. at 617, and the court looks to three factors to guide its inquiry: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action," *Penn Cent.*, 438 U.S. at 124.  While these factors provide "important guideposts," "[t]he Takings Clause requires careful examination and weighing of all the relevant circumstances."  *Palazzolo*, 533 U.S. at 634, 636 (O'Connor, J., concurring); *see also Tahoe-Sierra*, 535 U.S. at 321 (whether a taking has occurred "depends upon the particular circumstances of the case"); *Yee v. City of Escondido*, 503 U.S. 519, 523 (1992) (regulatory takings claims "entail[] complex factual assessments").

## ANALYSIS

In its decision, the court of appeals left open whether the criteria of *Lucas* or *Penn Central* should be applied, dependent upon the evidentiary record respecting economic loss.  *See Lost Tree II*, 707 F.3d at 1295.  Because the relevant parcel has been redefined, the court must reevaluate the economic loss of the permit denial with Plat 57 alone as the relevant parcel, and then determine whether a compensable taking occurred.

### A. *Lucas*

While per se rules are disfavored in takings law, a subset of regulatory takings are categorically compensable "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle."  *Lucas*, 505 U.S. at 1015.  A total loss of economically beneficial use is required.  *See Tahoe-Sierra*, 535 U.S. at 330 (affirming that a diminution in value of 95% would not constitute a categorically compensable taking) (citing *Lucas*, 505 U.S. at 1019 n.8).

In this instance, the inquiry is whether Plat 57 retains any economically beneficial use without a Section 404 permit.  Both parties submitted appraisals for Plat 57.  The government's appraiser, Mr. Underwood, testified that Plat 57 was worth $30,000 without the permit.  *Lost Tree I*, 100 Fed. Cl. at 426.  Lost Tree's expert, Mr. Armfield, valued the plat similarly at $25,000.  *Id.* at 425-26.  Mr. Armfield concluded that without the permit the property is "relegated to basically a wetland parcel with little or no economic use except at nominal levels that may be related to nuisance value or environmental use which typically does not support significant economic value except in support of mitigation activities in development of other lands."  DX 134 (at tenth unnumbered page).  Mr. Underwood testified that the highest and best

use of Plat 57 without a permit was as "passive recreation," which he described as "a place that human beings can go for relaxation, they can go to enjoy nature." Tr. 1008:10-17.[5]  Due to the minimal difference between the parties' estimates and general agreement on Plat 57's highest and best use without a permit, the court will simply take the average of the parties' estimates. Thus, the court finds that the value of Plat 57 without a permit is $27,500.

The parties agree that the highest and best use of Plat 57, had a fill permit been issued, would be for a single family home, the use for which it is zoned.  *See* DX 136 at 2; DX 134 (at ninth unnumbered page). Mr. Underwood engaged in a multi-step process to arrive at a valuation for Plat 57 with a permit.  DX 136 at 45.  Based on a sales-comparison approach, he concluded that Plat 57, if developed, would sell for approximately $1,875,000 per upland acre, for a rounded total of $4,720,000.  *Id.*[6]  Because Plat 57 was not yet developed, Mr. Underwood applied a number of deductions.  *Id.* at 46.  The chief deduction was the cost of construction work on the mitigation area at McCuller's Point and the different type of work necessary to prepare Plat 57 as a home site.  *Id.* at 45.  He considered the construction cost estimate prepared by Mr. Melchiori of On-Site Management Group of $489,612.  *Id.*; *see also* DX 134 (at 15th unnumbered page) (Melchiori's John's Island Plat 57 Construction Estimate).  That estimate encompassed the actual construction work needed for the distant mitigation area, the preparatory work on Plat 57, and miscellaneous surveying, engineering, legal, and other incidental fees.  *See* DX 134 (at 15th unnumbered page).  Mr. Melchiori's estimate also included a 10% contingency allowance for each category of these costs.  *Id.*  Mr. Underwood additionally took into account a review of Mr. Melchiori's estimate by James M. Hudgens of CZR Incorporated, which yielded an estimate of $501,712.  DX 136 at 45.  Mr. Underwood ultimately concluded that construction costs should be estimated at $500,000.  *Id.*  He made further deductions based on an "environmental risk"[7] and an "underestimation risk," for a combined deduction value of 15% of the construction cost, *i.e.*, an additional $75,000 in deductions.  *Id.*  In addition, Mr. Underwood specified a cost associated with a developer "assuming the time and risk of undertaking the entire project," which he referred to as "entrepreneurial incentive" and quantified at 5% of the plat's value as developed.  *Id.* at 46.  He lowered it from a typical 10% or 15% because Lost Tree had obtained all the other required permits for the development.  *Id.*  Thus, Mr. Underwood deducted $575,000 (construction costs and "risk" deductions) and $236,000 (entrepreneurial incentive) from $4,720,000 (estimated value of Plat 57 as developed) to reach a valuation for Plat 57 of $3,910,000.  *Id.*

The plaintiff's expert, Mr. Armfield, also used a land sales comparison approach, but concluded that Plat 57 as developed would have an estimated market value of $4,800,000.  DX

---

[5]Citations to the transcript of the trial are to "Tr.___."

[6]Mr. Underwood considered that 2.5183 upland acres would be present at Plat 57 as developed.  DX 136 at 45.

[7]Mr. Underwood defined environmental risk in terms of the work to be accomplished at the distant mitigation area, specifically the "risk . . . that environmental conditions could damage the wetlands and affect the validity of the mitigation plan and cause the five year monitoring plan to restart and necessitate cures from moderate to replanting the entire wetland."  DX 136 at 45.

134 (at ninth unnumbered page).  Similarly to Mr. Underwood, Mr. Armfield provided a series of deductions to account for construction costs and development risks.  *Id.*  Mr. Armfield relied solely on Mr. Melchiori's construction estimate of $489,612 for development costs.  *Id.*  Mr. Armfield deducted an additional $25,000 to account for an "incentive for a buyer to accept the risk and work associated with seeing the job to completion."  *Id.*  Overall, Mr. Armfield concluded that Plat 57, as permitted but not developed, would have an estimated market value of $4,285,388.  *Id.*

Until their most recent briefs, both parties operated under the assumption that the appropriate economic measures were the value of Plat 57 with a permit and the value of Plat 57 without a permit.  The government now attempts to displace its expert's trial testimony to this effect in favor of a new theory for valuing the economic impact of the permit denial.  *See* Def.'s Cross-Mot. at 17.  On remand, the government contends that the appropriate measures are (1) the value of Plat 57 the moment before the Section 404 permit was denied, thus encompassing the uncertainty of whether a permit would be granted, and (2) the value of Plat 57 without a permit.  *Id.* at 16-19.  Such an argument necessarily would require reopening the evidentiary record to accept new evidence regarding the new proposed value of Plat 57 the moment before the permit was denied.  Lost Tree opposed introduction of the new valuation theory on the grounds that: (1) the existing evidence was more than adequate for valuation purposes, (2) the government should not be allowed to change theories on remand, and (3) the government's new theory was conceptually invalid.  Pl.'s Mot. at 7-12.  The court permitted the government to file an evidentiary proffer to "address[] [its] theory and explain why the proffer should be accepted."  Hr'g Tr. 21:4-8.

The proponent of an evidentiary proffer must "express[] precisely the substance of the excluded evidence to inform both the trial court and the appellate court why exclusion of the evidence" might be prejudicial error.  *Polack v. Commissioner*, 366 F.3d 608, 612 (8th Cir. 2004) (internal citation and quotation omitted) (alteration in original).  The materials submitted by the government, namely, its cross-motion and the accompanying unsworn declaration by Mr. Underwood, do not provide enough specificity to constitute an evidentiary proffer and fail to persuade the court to reopen the record.

Mr. Underwood's one-page narrative declaration is limited to setting forth the types of materials he would need to consider to value Plat 57 under the "new hypothetical condition" that a permit had been applied for but that no decision had yet been made by the Corps.  Unsworn Underwood Decl.  Mr. Underwood neither undertook any actual analysis nor did he provide the court with specific numbers obtained through application of this new valuation theory. Additionally, he did not state with certainty that numbers could be ascertained from sources available to appraisers.  *See id.*  These types of deficiencies have led courts to find similar proffers inadequate for purpose of appellate review of evidentiary rulings pursuant to Fed. R. Evid. 103.  *See, e.g.*, *Inselman v. S & J Operating Co.*, 44 F.3d 894, 896 (10th Cir. 1995) (rejecting offer of proof because plaintiffs failed to examine witness and establish that he would testify as they believed); *Gates v. United States*, 707 F.2d 1141, 1145 (10th Cir. 1983) (affirming that merely telling the court the content of a witness's proposed testimony is not an offer of proof); *see also Perkins v. Silver Mountain Sports Club and Spa, LLC*, 557 F.3d 1141, 1147 (10th Cir. 2009) (evidentiary proffer requires more than "merely telling the court of the content

of . . . proposed testimony" (internal quotations and citations omitted)); *cf.*, *Fox v. Dannenberg*, 906 F.2d 1253, 1255, 1257 (8th Cir. 1990) (accepting a proffer where counsel stated with specificity the anticipated testimony of the excluded expert even though counsel did not put the proffered witness on the stand). Rule 103(a)(2) requires a party to preserve a claim of error resulting from an evidentiary ruling excluding evidence by "inform[ing] the court of its substance by an offer of proof, unless the substance was apparent from the context." Fed. R. Evid. 103(a)(2). If a party does not submit an adequate offer of proof, a reviewing court may only take notice of a "plain error affecting a substantial right," a more stringent level of review. Fed. R. Evid. 103(e).

In this instance, the proffer submitted by the government does not provide the court with enough substantive detail to determine the probative value of the evidence. Nor has the government provided any explanation for its failure to pursue its new theory earlier. Both parties previously submitted evidence regarding the proper valuation of Plat 57, and the government has failed to demonstrate why the court should displace its expert's prior testimony with a second valuation of Plat 57 performed in a quite different way.

Even if the court were to find the government's proffer to be adequate, the proposed alternative valuation method has no merit. The government may not lower the fair market value of Plat 57 by relying on the possibility of the very taking at issue. Prior attempts by the government to make this argument have been rejected by the Federal Circuit and this court's predecessor. Specifically, in *Loveladies Harbor, Inc. v. United States*, 21 Cl. Ct. 153, 156 & 156 n.5 (1990), *aff'd*, 28 F.3d 1171 (Fed. Cir. 1994), the plaintiffs asserted that the highest and best use for the disputed property was as a prepared site for a 40-lot residential development and submitted an appraisal assuming such development. The government attacked the plaintiff's appraisal as "inadequate because it d[id] not account for a possibility that all permits would not be obtained, a factor by which a knowledgeable buyer would discount his purchase price." *Id.* at 156. In response to the government's argument that the plaintiffs lacked the "*very permit approval by the Army Corps of Engineers that is at issue in this case*," *id.* (emphasis in original), the trial court recalled a similar argument made before the Federal Circuit in *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 905 (1986), stating, "This argument is reminiscent of defendant/appellant's argument in *Florida Rock*[,] to which the Federal Circuit responded, 'We suppose appellant added this contention to provide a little humor for an otherwise serious and scholarly brief, and say no more about it.' 791 F.2d at 905. Neither shall this court," *Loveladies Harbor*, 21 Cl. Ct. at 156 n.5.

Valuing Plat 57 in accord with its fair market value at its "highest and best use," [8] meaning with a Section 404 permit or absent the regulatory scheme entirely, is consistent with prior precedent. *See, e.g.*, *Brace*, 72 Fed. Cl. at 350 (citing *Olson v. United States*, 292 U.S. 246, 255 (1934)), *aff'd*, 250 Fed. Appx. 359 (Fed. Cir. 2007); *Walcek v. United States*, 49 Fed. Cl.

---

[8] Highest and best use has been defined as "'[t]he reasonably probable and legal use of [property], which is physically possible, appropriately supported, financially feasible, and that results in the highest value.'" *Brace v. United States*, 72 Fed. Cl. 337, 350 (2006) (quoting *Loveladies Harbor*, 21 Cl. Ct. at 156) (alterations in original)), *aff'd*, 250 Fed. Appx. 359 (Fed. Cir. 2007).

248, 261-265 (2001) ("[T]he denominator of the economic value fraction must be the value of the entire [p]roperty, unencumbered by wetlands regulations."), *aff'd*, 303 F.3d 1349 (Fed. Cir. 2002); *Loveladies Harbor*, 21 Cl. Ct. at 157.  This is especially true in this case because, except for the Section 404 permit denial, Plat 57 feasibly could have been put to its highest and best use and it had obtained all of the other necessary permits and approvals.

Accordingly, the court will determine the economic impact of the permit denial according to the evidence previously submitted by both parties at trial, which presumed the relevant economic pinpoints were Plat 57 without a permit compared to Plat 57 with a permit and put to its highest and best use as a single family lot.  The parties' experts' opinions are relatively close in value.  Mr. Underwood estimated the fair market value of Plat 57 as developed would be $4,720,000, while Mr. Armfield estimated it as $4,800,000.  The values are very close and the court sees no reason to favor one over the other, so it will split the difference.  Thus, the court finds that the value of the Plat 57 as developed is $4,760,000.

The next step is evaluating the proper deductions for construction costs to find the value of Plat 57 as permitted, but not developed.  The court finds that Mr. Melchiori's construction estimate of $489,612.07 is reliable.  Because this estimate already includes a 10% contingency allowance for all costs, including mitigation area construction and lot preparation, the court will not also apply Mr. Underwood's additional deduction of 15% of the construction costs to account for an "environmental risk" or an "underestimation risk."  Both experts applied a deduction to account for a cost associated with convincing an owner or entrepreneur proceeding with the project to accept the risk of development.  Mr. Underwood calculates this risk as approximately 5% of the value of the plat as developed, *i.e.*, $236,000.  DX 136 at 46.  Mr. Armfield calculates this as approximately 5% of the costs of construction, *i.e.*, $25,000.  DX 134 (at ninth unnumbered page).  The court has already noted that Mr. Underwood's entrepreneurial incentive of $236,000 is excessive, *see Lost Tree I*, 100 Fed. Cl. at 437 n.33, and finds that Mr. Armfield's "entrepreneurial incentive" based on the estimated cost of construction is a more appropriate deduction.  Consequently, the court finds that the fair market value of Plat 57 as permitted is $4,245,387.93.

In conclusion, the court finds that the diminution of value, from $4,245,387.93 (value of Plat 57 as permitted and ready for preparation for use as a site for a home) to $27,500 (nominal value of Plat 57 without permit), is $4,217,887.93, or approximately 99.4%. Such a diminution of value constitutes a categorical taking under *Lucas*, particularly because the assigned valuation without a permit is a nominal amount that does not reflect any economic use.[9]

## B. *Penn Central* Factors

For completeness, the court will also apply its findings of fact to the *Penn Central* framework.  No need exists for the court to reconsider its prior findings regarding the first two factors, *viz.*, the character of the governmental action and investment-backed expectations.  The

---

[9]Plat 57 does have some environmental value as a wetland, but that value has been reduced by the mosquito abatement measures undertaken decades previously, which left isolated hummocks and some stagnant eutrophic pools.

government has failed to demonstrate why it should be permitted to reargue these factors on remand. The law-of-the-case doctrine supports the court's decision not to reopen these findings. None of the three generally accepted exceptions apply here – no new evidence has been presented and accepted by the court; no controlling authority has rendered a contrary and applicable decision of law; and the prior decision was not clearly erroneous. *See Gindes*, 740 F.2d at 950. Indeed, the court of appeals examined and approved this court's prior findings regarding these factors. *See, e.g.*, *Lost Tree II*, 707 F.3d at 1294 ("The trial court's factual findings support the conclusion that Lost Tree had distinct economic expectations for each of Plat 57, Plat 55, and its scattered wetland holdings in the vicinity."). For context, the court will briefly describe its prior findings on the first two *Penn Central* factors before reanalyzing the economic impact factor in light of its findings on remand.

    *1. Character of the governmental action.*

    "The character of the governmental action factor requires a court to consider the purpose and importance of the public interest underlying a regulatory imposition." *Lost Tree I*, 100 Fed. Cl. at 438 (quoting *Maritrans Inc. v. United States*, 342 F.3d 1344, 1356 (Fed. Cir. 2003)). The Clean Water Act has a governmental objective of preserving the nation's waterways and wetlands. *Lost Tree I*, 100 Fed. Cl. at 438. In this case, however, the court was persuaded that the Corps singled out Lost Tree for adverse treatment. Testimony at trial demonstrated that had a different applicant requested a permit, the Corps would have responded favorably to the application. Moreover, the court doubted the Corps' contention that Plat 57 was a "high-quality" wetland due to "the trenching and mounding that had occurred on Plat 57 for mosquito-control purposes . . . and also the Town's and state court's findings that the wetlands involved were marginal." *Id.* at 439 (internal citations omitted). In sum, the court found that this factor weighs in favor of Lost Tree. *Id.*

    *2. Reasonable investment-backed expectations.*

    The regulatory regime in place at the time property is acquired is relevant to the determination of reasonable investment-backed expectations, but the existence of a regulatory regime does not preclude a reasonable expectation that a permit could be obtained. *See Lost Tree I*, 100 Fed. Cl. at 437-38 (citing *Palazzolo*, 533 U.S. at 633). In its prior decision, the court found that Lost Tree had developed overarching, unspecific development expectations when it acquired Gem Island and the Island of John's Island, including the portion that eventually became Plat 57, and that by 2001 or 2002, Lost Tree had developed investment-backed expectations specifically for Plat 57, but that those expectations were subject to the regulatory climate at the pertinent times. *Id.* at 416, 438. The court also concluded that Lost Tree's expectations were not unreasonable, given that "the adventitious projected development at McCuller's Point" was going to provide development credits and that it had obtained all other required local permits and approvals. *Id.* at 438. This factor does not weigh in either party's favor. *Id.* at 439.[10]

_____

    [10]The government extensively argued in its cross-motion that Lost Tree did not have reasonable investment-backed expectations for Plat 57 because it did not develop a distinct development plan for that tract until around 2002. *See* Def.'s Cross-Mot. at 19-25. The

*3. Economic Impact.*

"When considering *Penn Central's* economic impact factor, a court must 'compare the value that has been taken from the property with the value that remains in the property.'" *Maritrans*, 342 F.3d at 1358 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987)).   As the court has previously described, a diminution in value of 99.4% resulted from the Corps' action, and that degree of diminution weighs very strongly in Lost Tree's favor under the *Penn Central* factors.

## C. Synopsis

In accord with the Federal Circuit's mandate, the court has revisited the economic value of Plat 57 to determine whether a compensable taking occurred.  In that connection, both Lost Tree and the government were invited to adduce new evidence of valuation.  Lost Tree rested on the record established at the trial, while the government sought to displace its valuation evidence admitted at trial in favor of a factually inadequate evidentiary proffer that also rested on an inappropriate theory.  The record evidence shows the potential fair market value of Plat 57 with a Section 404 permit, reflecting its highest and best use, as well as its current fair market value without a permit.  The fair market value of Plat 57 with a permit would be $4,245,387.93, and its current fair market value without a permit is $27,500.  The resulting 99.4% diminution in value effected a compensable categorical taking under *Lucas*.  An analysis under the *Penn Central* framework leads to the same result, *i.e.*, that a compensable taking occurred.

## D. Interest

"'If the [g]overnment pays the owner before or at the time the property is taken, no interest is due on the award[,] . . . [b]ut if disbursement of the award is delayed, the owner is entitled to interest thereon.'"  *Arkansas Game and Fish Comm'n v. United States*, 87 Fed. Cl. 594, 646 (2009) (quoting *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984)), *aff'd after remand from the Supreme Court*, 736 F.3d 1364 (Fed. Cir. 2013).  The interest awarded should be "sufficient to ensure that [the owner] is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation."  *Kirby Forest Indus.*, 467 U.S. at 10 (citing *Phelps v. United States*, 274 U.S. 341, 344 (1927) and *Seaboard Air Line Ry. v. United States*, 261 U.S. 299, 306 (1923)).  "The interest awarded by the court ought to emulate 'what a reasonably prudent person' would have received had he or she invested the funds to produce a reasonable return while maintaining safety of principal."  *National Food & Beverage Co. v. United States*, 105 Fed. Cl. 679, 704 (2012) (internal citations omitted).  In this

---

government asserts that an investment-backed expectation must exist at the time of purchase, and Lost Tree could not have had a reasonable investment-backed expectation at that time because the effects of the Clean Water Act were well-known to all.  *Id.* at 20-23.  This argument has no merit.  It reiterates points raised without success in connection with the original trial, ignores the effect of the adventitious development at McCuller's Point, and fails to take account of the Federal Circuit's explicit approval of this court's findings on the subject.

respect, the court regards the ten-year Treasury STRIPS rate as appropriate.  *See id.*[11]  STRIPS reflect minimal risk because they are government-based securities and ten years is a reasonable approximation of the duration between the taking, which occurred in August 2004, and the date of judgment.  STRIPS are "zero coupon" securities, and thus compounding is built into this financial instrument.  *See id.*

## CONCLUSION

For the stated reasons, the court finds that the Corps' denial of the Section 404 permit application for Plat 57 has effected a taking of Lost Tree Village Corporation's property.  The court awards Lost Tree $4,217,887.93, as measured by the fair market value of Plat 57 with a Section 404 permit minus the nominal value of Plat 57 without a permit.  The court awards interest on that amount at the ten-year Treasury STRIPS rate from August 2004 to the date the judgment is actually paid.

Final judgment to this effect shall be entered under Rule 54(b) of the Rules of the Court of Federal Claims because there is no just reason for delay.  The clerk shall issue judgment in accord with this disposition.

After all proceedings respecting this judgment have been completed, the court will address attorneys' fees and expenses under Section 304(c) of the Uniform Relocation Assistance and Real Property Acquisition Act, 42 U.S.C. § 4654(c).

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[11]The acronym STRIPS stands for "Separate Trading of Registered Interest and Principal of Securities."  *See STRIPS*, Treasury Direct, https://www.treasurydirect.gov/instit/marketables/strips/strips.htm (last visited Mar. 14, 2014).