# 𝕴𝔫 𝔱𝔥𝔢 𝖀𝔫𝔦𝔱𝔢𝔡 𝕾𝔱𝔞𝔱𝔢𝔰 𝕮𝔬𝔲𝔯𝔱 𝔬𝔣 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝕮𝔩𝔞𝔦𝔪𝔰

No. 08-117L

(Filed: November 14, 2017)

| | |
|---|---|
| ********************************* )<br>**LOST TREE VILLAGE** )<br>**CORPORATION,** )<br> )<br>**Plaintiff,** )<br> )<br>**v.** )<br> )<br>**UNITED STATES,** )<br> )<br>**Defendant.** )<br> )<br>********************************* ) | Takings case; attorneys' fees and expenses awardable under the Uniform Relocation Act, 42 U.S.C. § 4654(c); computation of interest |

Jerry Stouck, Greenberg Traurig, LLP, Washington, D.C., for plaintiff.

Jacqueline Brown, Trial Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs was Jeffrey H. Wood, Acting Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This action previously involved two opinions from this court, two appeals to the Federal Circuit, and a failed attempt to obtain Supreme Court review of a final judgment. Now, ancillary and collateral matters are before the court as the case is concluding. On March 14, 2014, the court entered judgment in favor of plaintiff, Lost Tree Village Corporation ("Lost Tree"), finding that the United States government, via the U.S. Army Corps of Engineers' denial of a fill permit, had "effected a taking of [Lost Tree's] property." *See Lost Tree Village Corp. v. United States*, 115 Fed. Cl. 219, 233 (2014) ("*Lost Tree III*"). After affirmance by the Federal Circuit, 787 F.3d 1111 (Fed. Cir. 2015) ("*Lost Tree IV*"), that judgment became conclusive on June 27, 2017 when the Supreme Court of the United States denied the government's petition for writ of certiorari, *United States v. Lost Tree Village Corp.*, 137 S. Ct. 2325 (2017) ("*Lost Tree V*"). At the time the court entered final judgment on the taking, it acted under Rule 54(b) of the Rule of the Court of Federal Claims ("RCFC") to defer consideration of any request for an award of attorneys' fees and expenses. *Lost Tree III*, 115 Fed. Cl. at 233-34. Now that "all proceedings respecting [the 2014] judgment have been completed," it is appropriate for the court to address attorneys' fees and expenses. *Id.* at 234.

1

Lost Tree has moved for an award of attorneys' fees and expenses under Section 304(c) of the Uniform Relocation Assistance and Real Property Acquisition Act ("Uniform Relocation Act"), 42 U.S.C. § 4654(c). *See* Pl. Lost Tree's Mot. for Att'ys' Fees and Other Litig. Expenses ("Pl.'s Mot. for Fees") at 1, ECF No. 173. In addition, a dispute has arisen regarding the computation of interest due Lost Tree on the just compensation award. *See* Lost Tree's Mot. to Establish Amount of Interest Due Under the March 2014 Judgment ("Pl.'s Mot. for Interest") at 1, ECF No. 178. Both the question of fees and expenses and that of interest have been fully briefed and argued.

## BACKGROUND

Lost Tree filed the initial complaint in this case in February 2008. It alleged that in denying Lost Tree's application for a fill permit in August 2004, the U.S. Army Corps of Engineers ("the Corps") effectuated an uncompensated taking by eliminating all economically viable use of its land, thereby contravening the Fifth Amendment to the United States Constitution. *See Lost Tree Village Corp. v. United States*, 100 Fed. Cl. 412, 414 (2011) (*"Lost Tree I"*), *rev'd and remanded*, 707 F.3d 1286 (Fed. Cir. 2013) ("*Lost Tree II*"). In a post-trial opinion rendered in August 2011, this court held that no taking had occurred, but rather that the Corps' "denial resulted in a noncompensable diminution in the value of Lost Tree's property." *Id.* at 439. On appeal, the Federal Circuit held that the court had erred in its determination of the relevant parcel for purposes of the takings analysis and remanded for a "determin[ation of] the loss in economic value to [Lost Tree's property] . . . [under] the appropriate framework." *Lost Tree II*, 707 F.3d at 1294-95. On remand, this court determined that under both the *Lucas* and, alternatively, the *Penn Central* regulatory takings frameworks, the Corps' denial of a fill permit effected an uncompensated taking and entered judgment for Lost Tree. *Lost Tree III*, 115 Fed. Cl. at 233 (referring to *Lucas v South Carolina Coastal Council*, 505 U.S. 1003 (1992), and *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978)). The court awarded Lost Tree $4,217,887.93 in damages and determined that it was entitled to interest at the "ten-year Treasury STRIPS rate," which entailed semi-annual compounding. *Id.*

The case then returned to the court of appeals for the Federal Circuit. *See generally Lost Tree IV*, 787 F.3d 1111. The Federal Circuit affirmed the judgment for Lost Tree in June 2015, holding that the Corps' "permit denial constituted a per se regulatory taking under *Lucas*." *Id*. at 1119. The government then sought a writ of certiorari from the Supreme Court of the United States. *See* Petition for writ of certiorari, *United States v. Lost Tree Village Corp.*, 2016 WL 1166134 (U.S. Mar. 22, 2016) (No. 15-1192). The Supreme Court deferred a decision on that petition until June 2017, when it was denied, rendering final the judgment of this court entered in 2014. *See Lost Tree V*, 137 S. Ct. 2325.

In July 2017, Lost Tree moved "for the [c]ourt to award Lost Tree its attorneys' fees and other litigation expenses in accordance with [the Uniform Relocation Act]." Pl.'s Mot. for Fees at 1. Lost Tree seeks $2,137,401.56 for attorneys' fees and litigation expenses, $49,881.54 for "engineering/consulting fees and expenses," $14,394.15 for "appraisal fees and expenses," and $28,548.83 for "trial travel and other case-related expenses incurred and paid for by Lost Tree" for a total of $2,230,226.08. Pl.'s Mot for Fees at 1; Pl. Lost Tree's Suppl. to Its Mot. for Att'ys' Fees and Other Litig. Expenses ("Pl.'s Suppl. Mot."), ECF. No. 183; Pl. Lost Tree's Second

Suppl. to Its Mot. for Att'ys' Fees and Other Litig. Expenses ("Pl.'s Second Suppl. Mot."), ECF No. 185, Ex. 1.  The government contests the attorneys' fees to which Lost Tree is entitled, seeking to reduce the total amount of attorneys' fees to "no more than $1,078,121.40."  Def.'s Resp. in Opp'n to Pl.'s Mot. for Fees (Def.'s Opp'n to Fees") at 16, ECF No. 177.  The government does not dispute Lost Tree's entitlement to engineering and appraisal fees and expenses.  *See* Pl.'s Reply to Defendant's Opp'n to Pl's Mot. for Fees ("Pl.'s Reply for Fees") at 1-2, ECF No. 179.

Lost Tree's motion to establish the amount of interest due under the judgment in *Lost Tree III* was filed on September 26, 2017.  *See generally* Pl.'s Mot. for Interest.  The parties agreed that the appropriate interest rate for the 10-year security specified by the court, a Treasury "STRIP,"[1] was 4.614%, but "attempted [unsuccessfully,] to reach [an] agreement . . . on the total amount of interest calculated at that rate."  *Id.* at 1-2.  The principal disagreement about interest is whether the interest should be compounded annually, semi-annually, or not at all.  *Compare* Def.'s Resp. in Opp'n to Pl.'s Mot. for Interest ("Def.'s Opp'n to Interest") at 2-3, ECF No. 181, (arguing that interest is built into the ten-year Treasury STRIP and thus there should be no compounding, or, in the alternative, that interest should be compounded annually), *with* Pl.'s Reply to Def.'s Opp'n to Interest ("Pl.'s Reply for Interest") at 1, ECF No. 182, (arguing that interest on Treasury STRIPS traded in the market in effect compounds semi-annually).  By Lost Tree's calculations, based on semi-annual compounding of interest, it should be entitled to interest amounting to $3,512,627.45 for the period of August 24, 2004, the date the taking occurred, through November 15, 2017, "with a per diem rate of $990.79 thereafter."  Pl.'s Mot. for Interest at 3.  The government claims that on the basis of simple interest or annual compounding, as of November 16, 2017, Lost Tree is entitled to interest of $2,583,292.26 with a $533.19 per diem rate (simple interest) or $3,458,624.32 with a $958.40 per diem rate (annual compounding).  Def.'s Opp'n to Interest at 3 & n.3.

## ANALYSIS

### A. *Fees and Expenses*

By Section 304(c) of the Uniform Relocation Act, Congress waived federal sovereign immunity as to attorneys' fees and expenses in takings cases.  The Uniform Relocation Act states that this "court . . . shall determine and award . . .  such sum as will in the opinion of the court . . . reimburse [the] plaintiff for his *reasonable* costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, *actually incurred* because of such proceeding."  42 U.S.C. § 4654(c) (emphasis added).  Courts consider "a number of factors" in determining the reasonableness of attorney's fees.  *See Hubbard v. United States*, 480 F.3d 1327, 1332 (Fed. Cir. 2007) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)).

---

[1]"STRIP" is the acronym for "Separate Trading of Registered Interest and Principal of Securities."  For detailed information about Treasury STRIPS, see Treasury Direct, https://www.treasurydirect.gov/instit/marketables/strips/strips.htm (last visited November 14, 2017) ("STRIPS let investors hold and trade the individual interest and principal components of eligible treasury notes and bonds as separate securities.").

"[T]he most critical factor," and the threshold inquiry to determine if *all* costs and fees incurred may be reimbursed, "is the degree of success obtained." *See Hubbard*, 480 F.3d at 1333 (citing *Hensley*, 461 U.S. at 436). "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. . . . But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." *Hensley*, 461 U.S. at 435, 440. But, "[t]here is no authority for awarding . . . a windfall on the basis of result[s] achieved, litigation risk[,] or any other consideration." *Florida Rock Indus., Inc. v. United States*, 9 Cl. Ct. 285, 290 (1985).

With one limited exception, Lost Tree has been billed and has paid the attorneys' fees and expenses that are sought to be recovered in this case. Nonetheless, the government claims that Lost Tree's requested fee award is unreasonable, and therefore should be reduced, on five grounds: (1) Lost Tree paid "excessive rates for attorney and paralegal work;" and Lost Tree seeks reimbursement for (2) "work done on matters unrelated to th[e] case;" (3) "work where [an unreasonable amount of] hours [were] devoted [to the billed] tasks;" (4) "work where . . . senior personnel were performing [the] tasks [of] junior personnel;" and (5) "reimbursement for a[n as-yet-unpaid] $300,000 bonus." Def.'s Opp'n to Fees at 1. The court will consider each contention in turn.

The government argues that Lost Tree's attorneys' fees, "as high as $810/hour for lead counsel" and $300/hour for paralegal work, are unreasonable because Lost Tree "did not attach any evidence or provide any argument explaining the reasonableness of [its] rates." Def.'s Opp'n to Fees at 9 (Lost Tree's "fee petition does not . . . meet the minimum evidentiary hurdle of *Blum* [*v. Stenson*, 465 U.S. 886 (1984)] . . . to provide evidence of the reasonable market rate."). In the government's view, Lost Tree "cannot show it is entitled to premium rates absent [this] evidence about market rates, which [it] ha[s] failed to provide." *Id.* at 10.

To be sure, Lost Tree, like all plaintiffs, "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates," *Hensley*, 461 U.S. at 437, but the government's reliance on *Blum* is misplaced. In *Blum*, the Supreme Court was concerned with "a private nonprofit law office" that submitted a fee request that "reflected a 50% increase in" the fees it actually charged. 465 U.S. at 890-91. The Court concluded that the firm did not "carry [its] burden of justifying entitlement to an upward adjustment" in its rates. *Id.* at 901-02.

*Blum* is distinguishable from this case. Lost Tree does not seek an upward adjustment in rates but rather a reimbursement for fees actually paid. Fees incurred and paid by a client at an agreed rate are presumptively reasonable because "[i]n reaching agreement, lawyer and client have already considered and weighed all the relevant factors." *Florida Rock Indus.*, 9 Cl. Ct. at 290 (citing *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 24-26 (D.C. Cir. 1984) ("[W]hen fixed market rates already exist, there is no good reason to tolerate the substantial costs of turning every attorneys['] fee case into a major ratemaking proceeding. *In almost every case, the firms' established billing rates will provide fair compensation.*") (emphasis in original), *overruled in part on other grounds by Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc)). In such cases, "[s]ubmission of invoices and billing records is [sufficient to] satisfy this burden." *Rumsey v. Department of Justice*, 866 F.3d 1375, 1379 (Fed. Cir. 2017).

Lost Tree has met that burden by "providing the government [with] invoices covering th[e] fees and expenses" it has paid.  Pl.'s Reply for Fees at 2.  In these circumstances, the onus shifts to the government to "identify unrecoverable expenditures," *see Rumsey*, 866 F.3d at 1380, *i.e.*, those out of step with "the prevailing market rate," *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

In endeavoring to meet that burden, the government has pointed to use of the Office of the United States Attorney for the District of Columbia's Laffey Matrix.  Def.'s Opp'n to Fees at 10-11.[2]  As the government notes, the Federal Circuit in *Biery* determined that the Laffey Matrix "provide[s] a reasonable rate" for fee calculation.  *Biery*, 818 F.3d at 714.  But the Federal Circuit nonetheless "decline[d] to exclusively endorse" the Laffey Matrix, *id.*, holding instead that in that case it was not an abuse of the lower court's discretion to apply it, *id.* at 710, 714 (determining that it was not "clearly unreasonable, arbitrary or fanciful" to apply the Laffey Matrix).

Most importantly, *Biery* was a contingency fee case; the client had not yet paid the attorneys' fees, and the rate was to be determined "at the end of the case" with the attorneys bearing the risk of loss.  *Id.* at 708.  As *Laffey* itself implies, the Matrix is meant to address cases in which "no relevant billing histories" exist.  746 F.2d at 24.  "But when fixed market rates already exist, there is no good reason to tolerate the substantial costs of turning every attorneys['] fee case into a major ratemaking proceeding."  *Id.*  Absent any evidence to the contrary, the rate of reimbursement Lost Tree seeks for both attorney and paralegal work is reasonable.[3]

In addition to concern about excessive rates, the government argues that Lost Tree seeks reimbursement for excessive hours of legal work, either by overstaffing or billing more time than was strictly necessary for the task.  Def.'s Opp'n to Fees at 14-15.  Specifically, reimbursement for "178.5 hours of work done with respect to the preparation of the stipulations of fact," "excessive entries . . . for research done on one legal issue in advance of the filing of the complaint . . . [and] work on seemingly-numerous memoranda to Lost Tree," and for "junior personnel accompan[ying] senior attorneys . . . [to oral arguments, depositions, and hearings] where their presence was not necessary."  *Id.*  Here, the government fails to account for the interest of the client, the importance of Lost Tree's success on the merits, and the presumption

---

[2]The *Laffey* Matrix is a schedule of reasonable rates for attorneys in the Washington, D.C. metropolitan area who are engaged in complex federal litigation.  *See Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354, 371-72 (D.D.C. 1983), *aff'd in part, rev'd in part*, 476 F.2d 4.  The Matrix is maintained by the United States Attorney's Office, and adjustments "are based on changes to the cost of living in the Washington, D.C. metropolitan area as measured by the Consumer Price Index for all Urban Consumers ('CPI-U')."  *Biery v. United States*, 818 F.3d 704, 713 (Fed. Cir. 2016).

[3]Out of an excess of caution, Lost Tree supplied excerpts from a survey of hourly billing rates in Washington, D.C. as of January 1, 2017 of 61 participating D.C. law firms, as compiled by a consultant used by the firms.  *See* Pl.'s Reply for Fees Ex. E.  That compilation shows that the rates billed to Lost Tree were below the median.  *Id.*

that favors Lost Tree, which not only incurred but actually paid these costs before seeking reimbursement under the Uniform Relocation Act.  The same market concerns applicable in the fee context also apply to the determination of the reasonable number of hours billable to a client.

As to the stipulation of facts, this was a difficult, fact-bound case, the type of case in which the stipulations provided a factual baseline for more detailed exegesis through testimony. The court is hesitant to draw a bright line as to how many hours an attorney should spend developing the factual baseline when the trial extended over seven days even with the extensive stipulations.  The stipulations were quite helpful in focusing the trial testimony, and, notably, Lost Tree promptly paid the fees billed for the hours working on the stipulations.

As to memoranda, the so-called "excessive entries" the government cites addressed the "parcel as a whole" doctrine.  Def.'s Opp'n to Fees App. 4, at 44.  The parcel as a whole and the "relevant parcel" question are two sides of the same coin, and the latter was the dispositive question in this case.  Researching and writing memoranda delineating that doctrine and exploring its implications for Lost Tree was necessary, and Lost Tree's complete success on the merits in this case demonstrates the reasonableness of the time spent and billed.

Finally, in critiquing junior associates accompanying senior attorneys at oral arguments and depositions, the government seems to assume that this arrangement is a training mechanism only and does not provide any benefit to the client.  But, this contention discounts the fact that the junior would have worked with the senior in preparation for the proceedings.  And, having a second set of eyes and ears at such proceedings can provide insight that the more senior attorney, busy with actually carrying out the deposition or oral argument, may otherwise miss.  It is not unreasonable for an attorney to bill for such insight, for a client to pay for it, or to include such costs in a fee application for reimbursement.

The government also asserts that Lost Tree seeks reimbursement for $8,220 worth of work done on matters unrelated to the case.  Def.'s Opp'n to Fees at 1, 11.  The fees and costs at issue were incurred through "communication with other counsel, case research, coordination regarding the filing of an *amicus* brief, and travel to oral argument in the matter of *Murr v. Wisconsin*."  *Id.* at 11 (referring to proceedings in the Supreme Court respecting *Murr v. Wisconsin*, ___ U.S. ___, 137 S. Ct. 1933 (June 23, 2017)).  The government claims that Lost Tree is seeking "fees . . . for work about a potential lawsuit . . . but not strictly [about] the Fifth Amendment claim" at issue, Def.'s Opp'n to Fees at 12 (citing *Preseault v. United States*, 52 Fed. Cl. 667 (2002)), and that such work was "unnecessary."  *Id.* at 11 (citing *Hensley*, 461 U.S. at 434).  Despite the government's efforts to divorce this case from *Murr*, however, it was the government itself that endeavored to pair them.  *Murr*, like *Lost Tree IV*, concerned the "relevant parcel" issue in takings jurisprudence.  *Murr*, 137 S. Ct. at 1943-48.  When the government sought certiorari from the Federal Circuit's decision *Lost Tree IV*, it "link[ed the case] to *Murr*" and sought either to obtain concurrent Supreme Court review of the cases or to have the petition in *Lost Tree* held for disposition of *Murr*.  *See* Pl.'s Reply for Fees at 18.

In *Preseault*, the plaintiffs sought reimbursement for fees associated with an action before the Interstate Commerce Commission ("ICC"), which took place before the plaintiffs filed and prevailed in their suit before the Court of Federal Claims.  52 Fed. Cl. at 669-70, 672.  The

court determined that the fees and expenses incurred in the action before the ICC were not "because of" the action before the court and therefore could not be reimbursed. *Id.* at 670-72. Unlike the plaintiffs in *Preseault*, Lost Tree incurred fees relating to the *Murr* case "because of" its Fifth Amendment takings claim in this case. Both *Murr* and this case concerned the same fundamental legal question, and the government had argued in its petition for certiorari that the outcome of *Murr* would likely affect *Lost Tree*. The government attempts to apply hindsight to assert that Lost Tree's *amicus* and other coordination efforts "did nothing to advance the claims in this case" because the Supreme Court "ultimately rejected" the petition for certiorari. Def.'s Opp'n to Fees at 12. That latter fact may be true, but the standard for reasonableness is not retrospective. If the petition in *Lost Tree* had been granted, familiarity with *Murr*, gleaned from following the case through the Supreme Court, coordinating with *amicus*, attending the oral argument, and reviewing the Supreme Court's decision may very well have advanced Lost Tree's claims. Lost Tree could not know ahead of time that such efforts would be unnecessary, and it made those efforts "because of" its vested interest in the outcome of this case. It was therefore reasonable for Lost Tree to incur the fees and expenses associated with proceedings related to the *Murr* case.

The government also seeks to reduce Lost Tree's potential fees by discounting work that "was not of a nature warranting the expertise of a senior partner, but [was] instead more akin to work of legal support staff or junior counsel." Def.'s Opp'n to Fees at 12-13. The government specifically questions time "devoted to seeking reimbursement of [attorneys'] fees." *Id.* at 13. Lost Tree seeks reimbursement for 192.7 hours of work preparing the fee application, 77.1 of which were billed by a senior partner. Pl.'s Reply for Fees at 19. In the usual case, the government may be right that "fees on fees work" does not merit so much attention from a senior partner. But this is not the usual case. From the filing of the complaint to final judgment, this case spanned nine years of complex litigation. Initially, two associates and the senior partner worked on this case, but by the time the judgment went final "the two principal associates who previously worked on the case . . . ha[d] not done so for several years." *Id.* at 20. It made sense for the senior partner to take the lead in preparing the fees application because "any other lawyer would have had to get up to speed" on the case. *Id.* While the senior lawyer's hours may have been more expensive, the efficiency gained through familiarity may have *saved* the government money. But even if it did not, under the circumstances, Lost Tree's fee application for fees on fees work was reasonable.

The government's final argument is that Lost Tree's fees reimbursement should not include the "success fees" that arose out of the fee agreement for the appeal before the Federal Circuit in *Lost Tree II.* Def.'s Opp'n to Fees at 7-9. The agreement stated that Lost Tree's counsel "will handle the appeal . . . for a fixed fee of $67,500." Pl.'s Mot. for Fees App. at 252. But "if Lost Tree prevail[ed] ultimately in the case and recover[ed] just compensation, [counsel] will be entitled to a success fee of $300,000" so long as the "success fee is recoverable from the government as part of the reasonable attorneys' fees due to Lost Tree." *Id.* Alternatively, if Lost Tree prevailed and the success fee was not so recoverable, counsel would be "entitled to recover from Lost Tree the actual amount of legal fees [it] billed . . . at [its] standard rates (net of the $67,500 fixed fee)." Pl.'s Mot. for Fees App. at 252. The government's contends that the Uniform Relocation Act does not cover this kind of alternative success-fee agreement because the Act only calls for reimbursement of "reasonable attorney fees actually incurred." Def.'s

Opp'n to Fees at 7 (brackets and ellipses omitted). In the government's view, under the terms of the agreement itself, Lost Tree could never incur the cost of the $300,000 success fee because it is only "payable by the United States." *Id.* It avers that Lost Tree has not and "will never pay anything toward the bonus" and so it cannot be "reimbursed" as the statute requires. *See id.* at 7-8.

Lost Tree relies on *Phillips v. General Servs. Admin.*, 924 F.2d 1577 (Fed. Cir. 1991) to refute the government's argument that Lost Tree must be required to pay the fee for it to have "incurred" the cost under the statute. *See* Pl.'s Reply for Fees at 15. Upon analysis, *Phillips* does not require the result that Lost Tree seeks. There, the court determined that fees associated with a contingency fee agreement were "incurred" in connection with a claim under the Back Pay Act, even though the plaintiff would never have to pay them. *See* 924 F.2d at 1581. That contingency fee agreement required an upfront payment of $2,500 and "whatever additional fee that might be allowed to [counsel] for his services in [the] court" if Phillips ultimately prevailed. *Id.* at 1579. When Phillips did prevail, the court awarded fees consistent with the "hourly rate and the number of hours spent on the case." *Id.*

In this case, the proper disposition of the government's contention regarding success fees is governed by a set of factors. First, Lost Tree is not seeking reimbursement for the success fee, it has not paid it. And it is not required to do so under the agreement. Second, in a departure from *Phillips*, the specifically stated success fee of $300,000 here is not determined with regard to the hourly rate and the number of hours spent on the case; Lost Tree's counsel seeks that amount consistent with "the risk that it would never receive more than the initial fixed fee of $67,500." Pl.'s Reply for Fees at 16 n.6. Anticipating these difficulties, the alternative aspect of the fee agreement explicitly allows for the possibility that the success fee may "not [be] recoverable" under the Uniform Relocation Act and provides for a fees/hours alternative instead. Pl.'s Mot. for Fees App. at 252. This alternative in the agreement specifies an outcome consistent with *Phillips*, and that portion of the agreement will be applied. In addition to the $67,500 fixed fee, Lost Tree is entitled to reimbursement for $91,031.64 as "the actual amount of legal fees billed [for] the appeal at [the] standard rate." *See* Pl.'s Reply for Fees at 16 n.6; Pl's Mot. for Fees App. at 252.

## B. *Interest*

The crux of the dispute over interest in this case is a disagreement about compounding interest and how the provision for interest in the decision in *Lost Tree III* should be applied. *Compare* Def.'s Opp'n to Interest at 2-3 (arguing that interest is built into the ten-year Treasury STRIP interest rate and thus there should be no compounding, or, in the alternative, that interest should be compounded annually), *with* Pl.'s Reply for Interest at 1 (arguing that interest on Treasury STRIPS traded in the market in effect compound semi-annually). In *Lost Tree III*, this court determined that the use of "the ten-year Treasury STRIPS rate [was] appropriate." 115 Fed. Cl. at 233. As the court observed, "STRIPS reflect minimal risk because they are government-based securities and ten years is a reasonable approximation of the duration between the taking, which occurred in August 2004, and the date of judgment." *Id.* The court noted that "STRIPS are "zero coupon" securities, and *thus compounding is built into this financial instrument*." *Id.* (emphasis added). The government has read the italicized statement to indicate

that the total damages to Lost Tree should be calculated with "simple interest" and "with no compounding."  Def.'s Opp'n to Interest at 2.

This understanding is inconsistent with how Treasury STRIPS function in the market. Treasury notes and bonds generally pay interest every six months.  Treasury STRIPS derived from such notes and bonds generate accrued payments which are "recorded as accrued interest" "even though [they] [are] not received until maturity or the STRIPS are sold." *See* Treasury Direct, https://www.treasurydirect.gov/instit/marketables/strips/strips.htm (last visited November 14, 2017).  In short, interest accrues and is compounded and recorded semi-annually.  The interest on Lost Tree's just compensation will be determined at the 4.614% rate accepted by the parties as reflecting the imputed interest payable on ten-year STRIPS purchased in August 2004, the date of the taking, compounded semi-annually.

## CONCLUSION

The judgment previously entered under RCFC 54(b) in the amount of $4,217,887.93 and affirmed on appeal remains in place.  Now, for the reasons stated above, the court rules that under the prior judgment, $3,512,627.45 in interest is due for the period of August 24, 2004 through November 15, 2017, with a per diem rate of $990.79 thereafter until the judgment is actually paid.

Pursuant to the Uniform Relocation Act, the court awards reasonable attorneys' fees and expenses of $2,230,226.08 less $208,968.36, the difference between the success fee and actual legal costs for the first appeal, for a total of $2,021,257.72.  The clerk is directed to enter judgment in accord with this disposition.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge